**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term
Grand Jury sworn in on September 30, 2004**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **GRAND JURY ORIGINAL** |
| | : | |
| **SEAN GARLAND,** | : | **VIOLATIONS:** |
|   also known as "the Man with the Hat", | : | |
| **CHRISTOPHER JOHN CORCORAN,** | : | **18 U.S.C. § 371** |
|   also known as "Christie", | : | **(Conspiracy)** |
| **DAVID LEVIN,** | : | |
|   also known as David Batikovich Batikian, | : | **18 U.S.C. § 470** |
|   also known as Gediminas Gotautas, | : | **(Counterfeit Acts Committed** |
|   also known as "Russian Dave", | : | **Outside the United States)** |
|   also known as "Doctor", | : | |
| **TERENCE SILCOCK,** | : | **18 U.S.C. § 473** |
|   also known as "Terry", | : | **(Dealing in Counterfeit** |
| **HUGH TODD,** | : | **Obligations or Securities)** |
|   also known as F. B. Rawing, | : | |
|   also known as Peter Keith Clark, | : | |
| **ALAN JONES,** | : | |
|     and | : | |
| **MARK ADDERLEY,** | : | |
| | : | |
|     **Defendants.** | : | |

**I N D I C T M E N T**

The Grand Jury charges:

**COUNT ONE**
**(Conspiracy to Commit Counterfeit Acts Outside the United States)**

At all times material to this Indictment:

## INTRODUCTION

### Defendants and Associates

1.      Defendant **SEAN GARLAND** was a citizen of the Republic of Ireland ("Ireland") residing in the vicinity of Dublin, Ireland, and was Managing Director of an international business consulting company called GKG Communications International, Ltd. ("GKG Comms"), located in Dublin, Ireland.

2.      Defendant **CHRISTOPHER JOHN CORCORAN**, also known as Christie, was a citizen of Ireland, residing in the vicinity of Dublin, Ireland, had long been associated with defendant **SEAN GARLAND**, and had established a business relationship with defendant **TERENCE SILCOCK**.

3.      Defendant **DAVID LEVIN**, also known as David Batikovich Batikian, also known as Gediminas Gotautas, was a native of Russia, with residences in the vicinities of Birmingham and London, United Kingdom.

4.      Defendants **TERENCE SILCOCK**, also known as Terry, **ALAN JONES** and **MARK ADDERLEY** were citizens of the United Kingdom, residing in the vicinity of Birmingham, United Kingdom, and were long-time acquaintances of one another.

5.      Defendant **HUGH TODD**, also known as F.B. Rawing, also known as Peter Keith Clark, was a citizen of both Ireland and the Republic of South Africa ("South Africa"), and resided in South Africa, and was an associate of defendants **SEAN GARLAND** and **CHRISTOPHER JOHN CORCORAN**.

6.      The individuals referred to in this Indictment as "J.M", "J.D.", "A.B.", "T.L." and "G.D.", whose identities are known to the Grand Jury, were associates of defendant **SEAN GARLAND**.

7.      The individuals referred to in this Indictment as "H.J.", "M.M." and "R.C.", whose identities are known to the Grand Jury, were associates of defendant **DAVID LEVIN**.

8.      The individuals referred to in this Indictment as "D.U." and "D.A.", whose identities are known to the Grand Jury, were associates of defendant **TERENCE SILCOCK**.

<u>**Introductory Allegations**</u>

9.      The United States Government alone is authorized by law to manufacture and issue United States Federal Reserve Notes (FRNs or "bills"), which are the official paper currency of the United States of America and are "obligations of the United States" within the meaning of 18 U.S.C. §§470 and 473.

10.      Beginning in or about 1989, and continuing throughout the period of this Indictment, a type of high-quality counterfeit $100 FRNs began to be detected in circulation around the world.  Their high quality made it particularly difficult for them to be detected as counterfeit by untrained persons.  The United States Secret Service initially designated these counterfeit notes as "C-14342" and they came to be known as "Supernote" or "Superdollar".

11.      When counterfeit currency such as the Supernote is sold to persons who know it is counterfeit, the sale price is a fraction of the currency's face value.  Eventually, counterfeit currency is exchanged for its full face value in goods or other currency, in transactions with persons and entities who do not know or suspect it is counterfeit.

12.     Quantities of the Supernote were manufactured in, and under auspices of the government of, the Democratic People's Republic of Korea ("North Korea").  Individuals, including North Korean nationals acting as ostensible government officials, engaged in the worldwide transportation, delivery, and sale of quantities of Supernotes.

13.     Defendant **SEAN GARLAND** was President of the Irish Worker's Party ("WP"). In the course of his official duties for the WP, defendant **SEAN GARLAND** would travel frequently to numerous countries, including the former Union of Soviet Socialist Republics and its successor states such as Russia, and would meet with officials of those and other countries, including North Korea.

14.     The Official Irish Republican Army ("OIRA"), also referred to as the "Old IRA", is a proscribed organization in Ireland and Northern Ireland that had been established in 1969 following a split in the Irish Republican Army.  Defendant **SEAN GARLAND** was the Chief of Staff of the OIRA.  The WP was the political party associated with the OIRA.

15.     During the early 1990s, Supernotes began appearing in Ireland. Thereafter, banks and money exchanges in Ireland declined to exchange $100 bills.

16.     During 1993 and 1994, defendant **HUGH TODD** was detected exchanging and attempting to exchange Supernotes for British currency at numerous banks in the United Kingdom; at the time of arrest for that activity, on July 27, 1994, he possessed Supernotes.

17.     In 1996, the United States began to issue a redesigned $100 bill; a distinctive feature of the change was that the portrait of Benjamin Franklin appearing in the center of the bill was significantly enlarged.  Thereafter, the older bills were commonly referred to as "small heads" and the new bills were commonly  referred to as "big heads".  Four security features of

the "big heads" were the use of a particular optically variable ink ("OVI"), the use of an enhanced embedded security thread, a security watermark, and changed microprinting.

18.     In the late 1990s, and continuing throughout the period of this Indictment, Supernotes in the "big head" design began to be detected in circulation around the world; they were initially designated by the United States Secret Service as "C-21555".

19.     In or about October 1997, defendant **SEAN GARLAND** and "J.M." traveled to Warsaw, Poland, where defendant **SEAN GARLAND** met with North Korean nationals to arrange for the purchase of a quantity of Supernotes.

## THE CONSPIRACY

20.     Beginning at least in or before December 1997 and continuing through at least on or about July 7, 2000, in the Republic of Ireland, the United Kingdom, Russia, Belarus, Poland, Denmark, the Czech Republic, Germany, and elsewhere outside the jurisdiction of any particular state or district of the United States but within the extraterritorial jurisdiction of the United States and therefore, pursuant to 18 U.S.C. § 3238, within the venue of the United States District Court for the District of Columbia, the defendants **SEAN GARLAND**, **CHRISTOPHER JOHN CORCORAN**, **DAVID LEVIN**, **TERENCE SILCOCK**, **HUGH TODD**, **ALAN JONES**, and **MARK ADDERLEY** unlawfully and knowingly combined, conspired, confederated, and agreed together and with others known and unknown to the Grand Jury, to commit offenses against the United States, that is to commit, outside the United States, counterfeiting acts – to wit: dealing, possessing, buying, selling, exchanging, transferring, receiving, and delivering counterfeited obligations of the United States (that is, $100 Federal Reserve Notes), with the intent that such counterfeited obligations of the United States be passed, published, and used as true and genuine – in violation of 18 U.S.C. §§ 470 and 473.

5

## Objects of the Conspiracy

21.     The objects of the conspiracy were:

a)      to make money by participating in buying and transporting Supernotes, and then either selling them for profit to persons who knew they were counterfeit, or passing them off as genuine to persons and businesses in exchange for legitimate currency or things of value;

b)      to maximize profit by obtaining Supernotes in substantial quantities as directly as possible from their ultimate source, North Korea, and then reselling them as quickly as possible in quantity at a higher price;

c)      to continually seek new buyers for quantities of Supernotes, while continuing to arrange additional purchases of Supernotes for existing buyers;

d)      to minimize expenditures and risk of loss, by having conspirators engaged in buying and transporting Supernotes either advance the funds for Supernotes or post a money bond against their loss;

e)      to protect the true source of the Supernotes, North Korea, and a principal purchaser of its Supernotes, defendant **SEAN GARLAND**, from detection and consequent disruption of their activities, by:

(1)      limiting to only very close associates of defendant **SEAN GARLAND** the true identity of the ultimate source of the Supernotes, that is, North Korea, and falsely letting other conspirators believe the source of the Supernotes was in Russia;

6

(2)      avoiding direct contact between defendant **SEAN GARLAND** and his less-senior conspirators and potential Supernote buyers, and instead using his close associates, including **CHRISTOPHER JOHN CORCORAN**, to make and maintain contact with them;

f)      to maintain operational security – that is, to evade and avoid detection by law enforcement, and consequent arrest, and disruption of the illegal activity – by:

(1)      using false, fraudulent identity documents, and the names and genuine identity documents of other persons, in order to travel and conduct transactions without identification;

(2)      "laundering" proceeds from Supernote transactions so as to conceal the true source of the proceeds;

(3)      practicing "compartmentation", that is, limiting information about any particular aspect of a transaction to those conspirators having a need to know it;

(4)      using unwitting persons to courier Supernotes and payments for Supernotes;

(5)      using codes – such as "jackets" and "paperwork" for Supernotes – and secure communications; and

(6)      whenever questioned by authorities, to deny, minimize, and lie about the illegal activity so as to avoid full disclosure of its true nature and scope and of the identities of persons participating in it.

7

**Manner and Means Used to Accomplish the Objects of the Conspiracy**

22.     The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

a)     Defendant **SEAN GARLAND** used his official capacities with the WP and GKG Comms – and particularly those entities' international associations and activities – as vehicles for traveling abroad (that is, outside of Ireland) and for communicating and meeting with persons abroad – including North Korean nationals engaged in the transportation and sale of Supernotes – and for arranging for the purchase, transportation, and resale of Supernotes.

b)     Other conspirators likewise used ostensibly legitimate business and personal reasons for travel, meetings, and other activities related to Supernote transactions.

c)     Defendant **SEAN GARLAND** used his OIRA associates to conduct activities on behalf of his Supernotes organization.

d)     The conspirators directly, and through one another and other associates, sought out individuals interested in buying quantities of Supernotes, and then arranged with those buyers the delivery of, and payment for, Supernotes.

e)     In order to maintain the confidence of potential buyers, the conspirators obtained, promised to obtain, and attempted to obtain, sample Supernotes to demonstrate their high quality.

f)     While maintaining their practice of "compartmentation" the conspirators exchanged among themselves information about past and planned transactions in order to understand operational problems and avoid them in future.

8

g)    Defendants **CHRISTOPHER JOHN CORCORAN**, **TERENCE SILCOCK** and **MARK ADDERLEY** identified and solicited defendant **DAVID LEVIN** as a person who would buy and arrange for transport of quantities of Supernotes, and maintained contact with him and his associates for the purpose of arranging Supernote transactions.  In order to buy and transport Supernotes, defendant **DAVID LEVIN** obtained funds and couriers from and through an associate in Latvia, "H.J."

h)    Defendants **ALAN JONES**, **TERENCE SILCOCK** and **CHRISTOPHER JOHN CORCORAN** identified and solicited two potential buyers of quantities of Supernotes, and maintained contact with them for the purpose of arranging Supernote transactions.

i)    Defendant **SEAN GARLAND** met with North Korean nationals to arrange for Supernote transactions, including transactions involving the new "big head" Supernotes.

j)    In January 1999 and June 1999, defendants **SEAN GARLAND**, **CHRISTOPHER JOHN CORCORAN** and **TERENCE SILCOCK** traveled to Moscow, Russia, to participate in the purchase of Supernotes, but on each occasion the transaction did not occur and later transactions were planned for, and executed in, Minsk, Belarus.

k)    When the "big head" Supernotes became available, conspirators who held "small head" Supernotes, including defendant **SEAN GARLAND**, sought to dispose of their remaining "small head" Supernotes before selling "big head" Supernotes.

l)    Payments for Supernotes from defendant **DAVID LEVIN** and others were conveyed to defendant **SEAN GARLAND** through defendant **CHRISTOPHER JOHN**

9

**CORCORAN**, often by hand delivery through couriers including the defendant **TERENCE SILCOCK** and other associates.

      m)      Conspirators and associates would carry Supernotes and payments for Supernotes between Ireland and the United Kingdom by ferry boat because ferry passengers did not undergo security checks.

      m)      Defendant **DAVID LEVIN** arranged for visas to be obtained for conspirators and their associates to travel to Russia and elsewhere.

      n)      Conspirators kept written notes indicating quantities of Supernotes and payments for Supernotes.

**Overt Acts**

    23.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, the conspirators committed the following overt acts, among others:

      (1)      In or about December 1997, in the United Kingdom, defendant **CHRISTOPHER JOHN CORCORAN** met with defendant **TERENCE SILCOCK**.

      (2)      On or about February 27, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

      (3)      On or about March 7, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

      (4)      On or about March 12, 1998, defendant **SEAN GARLAND** and associates traveled to Moscow, Russia.

      (5)      On or about March 24, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

10

(6)    In or about March 1998, in Ireland, defendant **CHRISTOPHER JOHN CORCORAN** gave sample Supernotes to defendant **TERENCE SILCOCK**.

(7)    In or about early 1998, in the United Kingdom, defendant **MARK ADDERLEY** introduced defendants **TERENCE SILCOCK** and **CHRISTOPHER JOHN CORCORAN** to defendant **DAVID LEVIN** as a potential buyer for Supernotes.

(8)    On or about April 9, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

(9)    On or about April 17, 1998, defendant **SEAN GARLAND** and associates, including defendant **HUGH TODD**, traveled to Moscow, Russia.

(10)    On or about May 5, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

(11)    On or about May 17, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

(12)    On or about June 5, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

(13)    On or about June 28, 1998, defendant **SEAN GARLAND** and associates, including defendant **HUGH TODD**, traveled to Moscow, Russia.

(14)    On or about July 10, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

(15)    On or about August 26, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

11

(16)    In or about mid-late 1998, defendant **DAVID LEVIN** gave money to defendant **TERENCE SILCOCK** in payment for Supernotes.

(17)    In or about mid-late 1998, in Ireland, defendant **TERENCE SILCOCK** obtained $100,000 in Supernotes from defendant **SEAN GARLAND** through **CHRISTOPHER JOHN CORCORAN**, in exchange for money he had received from **DAVID LEVIN**.

(18)    On or about October 30, 1998, in the United Kingdom, defendant **ALAN JONES** exchanged Supernotes at a Thomas Cook travel agency.

(19)    On or about October 31, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

(20)    On or about November 25, 1998, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland by ferry boat.

(21)    On or about December 14, 1998, defendants **TERENCE SILCOCK** and **ALAN JONES** traveled from the United Kingdom to Ireland by air.

(22)    In or about December 1998, in Ireland, defendants **SEAN GARLAND**, **CHRISTOPHER JOHN CORCORAN**, and **TERENCE SILCOCK** met and discussed traveling to Moscow, Russia, to obtain Supernotes for defendant **DAVID LEVIN**.

(23)    On or about December 15, 1998, defendants **TERENCE SILCOCK** and **ALAN JONES** traveled from Ireland to the United Kingdom by ferry boat.

(24)    On or about December 15, 1998, defendant **TERENCE SILCOCK** carried Supernotes, concealed on his person, from Ireland to the United Kingdom.

(25)    On or about December 15, 1998, defendant **ALAN JONES** carried Supernotes, concealed on his person, from Ireland to the United Kingdom.

12

(26)    On or about January 14, 1999, defendants **SEAN GARLAND**,

**CHRISTOPHER JOHN CORCORAN**, and **TERENCE SILCOCK** traveled to Moscow,

Russia to obtain Supernotes.

(27)    On or about January 26, 1998, defendant **TERENCE SILCOCK** traveled

from the United Kingdom to Ireland by ferry boat.

(28)    In or about January 1999, in Ireland, defendants **SEAN GARLAND** and

**CHRISTOPHER JOHN CORCORAN** discussed the need to dispose of "small head"

Supernotes before obtaining the new "big head" Supernotes.

(29)    On or about February 2, 1999, in the United Kingdom, defendant

**TERENCE SILCOCK** went to the residence of defendant **DAVID LEVIN**.

(30)    On or about February 5, 1999, at defendant **CHRISTOPHER JOHN**

**CORCORAN**'s direction, defendant **TERENCE SILCOCK** picked up defendant **HUGH**

**TODD** from the Birmingham Airport, in the United Kingdom, and took him to a hotel.

(31)    On or about February 6, 1999, in the United Kingdom, defendant

**CHRISTOPHER JOHN CORCORAN** explained to **HUGH TODD** how the January 1999 trip

to Moscow, Russia, had not been successful.

(32)    On or about February 6, 1999, in the United Kingdom, defendant

**CHRISTOPHER JOHN CORCORAN** told defendant **HUGH TODD** that defendant **SEAN**

**GARLAND** had given him "big head" Supernotes.

(33)    On or about February 6, 1999, in the United Kingdom, defendant

**CHRISTOPHER JOHN CORCORAN** gave a "big head" Supernote to defendant **HUGH**

**TODD**.

13

(34)    On or about February 6, 1999, in the United Kingdom, defendant **HUGH TODD** told defendant **CHRISTOPHER JOHN CORCORAN** that defendant **SEAN GARLAND** had given **TODD** a genuine passport of another person but bearing **TODD**'s photograph, for **TODD** to use in passing Supernotes.

(35)    On or about February 6, 1999, in the United Kingdom, defendants **CHRISTOPHER JOHN CORCORAN**, **TERENCE SILCOCK**, and **HUGH TODD** met together.

(36)    On or about February 10, 1999, in the United Kingdom, defendant **ALAN JONES** offered to obtain Supernotes for two potential buyers.

(37)    On or about March 21, 1999, in the United Kingdom, defendants **TERENCE SILCOCK** and **ALAN JONES** met with the two potential buyers of Supernotes and discussed obtaining samples for them.

(38)    On or about March 21, 1999, in the United Kingdom, defendants **TERENCE SILCOCK** and **ALAN JONES** told the two potential buyers of Supernotes that Supernotes could be obtained in Warsaw, Poland, or Minsk, Belarus, and that a person could carry, concealed, $250,000 in Supernotes.

(39)    On or about April 6, 1999, in the United Kingdom, defendant **TERENCE SILCOCK** told the two potential buyers of Supernotes that he expected to obtain samples delivered from Russia to his Irish contact, defendant **CHRISTOPHER JOHN CORCORAN**, and that the buyers' first purchase had to be for at least $250,000 in Supernotes.

(40)    On or about April 7, 1999, in the United Kingdom, defendant **TERENCE SILCOCK** went to the residence of defendant **DAVID LEVIN**.

14

(41)   On or about April 9, 1999, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland.

(42)   On or about April 21, 1999, in the United Kingdom, defendant **TERENCE SILCOCK** told one of the two potential buyers of Supernotes that he would be meeting the next day with his Irish contact, defendant **CHRISTOPHER JOHN CORCORAN**.

(43)   On or about April 22, 1999, defendant **CHRISTOPHER JOHN CORCORAN** traveled from Ireland to the United Kingdom.

(44)   On or about April 22, 1999, in the United Kingdom, defendants **CHRISTOPHER JOHN CORCORAN** and **TERENCE SILCOCK** went to the residence of defendant **DAVID LEVIN**.

(45)   On or about April 23, 1999, in the United Kingdom, defendants **TERENCE SILCOCK** and **ALAN JONES** met with the two potential buyers of Supernotes and discussed Supernotes due to arrive from Moscow, Russia.

(46)   On or about April 29, 1999, in the United Kingdom, defendants **TERENCE SILCOCK** and **DAVID LEVIN** had a conversation about laundering proceeds from illegal activity.

(47)   On or about May 18, 1999, in the United Kingdom, defendant **TERENCE SILCOCK** told the two potential buyers of Supernotes that he would be traveling to Moscow, Russia, with defendants **SEAN GARLAND** and **CHRISTOPHER JOHN CORCORAN**, and that defendant **DAVID LEVIN** was arranging for Russian visas for them.

(48)   On or about June 2, 1999, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland.

15

(49)     On or about June 8, 1999, in the United Kingdom, defendant **TERENCE SILCOCK**, in order to maintain the interest of the two potential buyers of Supernotes, led them to believe that $1 million in Supernotes had arrived in London.

(50)     On or about June 15, 1999, in the United Kingdom, defendants **TERENCE SILCOCK** and **ALAN JONES** met with the two potential buyers of Supernotes, discussed obtaining Supernotes, and said defendant **TERENCE SILCOCK** was traveling to Ireland on June 21, 1999, to meet with "the top man" – defendant **SEAN GARLAND**.

(51)     On or about June 21, 1999, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland, returning the same day.

(52)     On or about June 21, 1999, defendant **ALAN JONES** told the two potential buyers of Supernotes that defendant **TERENCE SILCOCK** was traveling to Russia on June 25, 1999.

(53)     On or about June 22, 1999, defendant **TERENCE SILCOCK** went to the residence of defendant **DAVID LEVIN**.

(54)     On or about June 24, 1999, defendant **CHRISTOPHER JOHN CORCORAN** traveled from Ireland to the United Kingdom.

(55)     On or about June 24, 1999, in the United Kingdom, defendant **DAVID LEVIN** gave passports containing Russian visas to defendants **CHRISTOPHER JOHN CORCORAN** and **TERENCE SILCOCK**.

(56)     On or about June 25, 1999, defendant **SEAN GARLAND** traveled to Moscow, Russia.

16

(57)    On or about June 25, 1999, defendants **CHRISTOPHER JOHN CORCORAN** and **TERENCE SILCOCK** traveled to Moscow, Russia.

(58)    On or about June 25, 1999, defendant **SEAN GARLAND** met in Moscow, Russia, with North Korean nationals.

(59)    On or about June 25, 1999, in Moscow, Russia, defendant **CHRISTOPHER JOHN CORCORAN** placed a call to the cellphone of defendant **SEAN GARLAND**.

(60)    On or about July 9, 1999, in the United Kingdom, defendants **TERENCE SILCOCK** and **ALAN JONES** met with the two potential buyers of Supernotes and explained that the Russia trip had gone ahead at defendant **SEAN GARLAND**'s direction, even though defendant **DAVID LEVIN** had forewarned them that police authorities had prior knowledge of the trip.

(61)    On or about July 27, 1999, in the United Kingdom, defendants **TERENCE SILCOCK** and **ALAN JONES** told the two potential buyers of Supernotes that defendant **SEAN GARLAND** was "the Colonel in Chief" of "the old style IRA" and "when he capitalizes on the paperwork" – meaning Supernotes – "it all goes back into the organization".

(62)    On or about July 27, 1999, defendant **TERENCE SILCOCK** instructed defendant **CHRISTOPHER JOHN CORCORAN** to travel to the United Kingdom to meet with the two potential buyers of Supernotes.

(63)    On or about July 31, 1999, defendant **CHRISTOPHER JOHN CORCORAN** traveled from Ireland to the United Kingdom.

17

(64)     On or about July 31, 1999, in the United Kingdom, defendants **TERENCE SILCOCK** and **CHRISTOPHER JOHN CORCORAN** met with the two potential buyers of Supernotes, and discussed defendant **SEAN GARLAND** and their travel to Moscow, Russia, to obtain Supernotes.

(65)     On or about August 1, 1999, in the United Kingdom, defendant **CHRISTOPHER JOHN CORCORAN** told the two potential buyers of Supernotes that defendant **SEAN GARLAND** had sent him to find out about a leak in the Supernote organization, and instructed the two potential buyers to maintain contact directly with defendant **CHRISTOPHER JOHN CORCORAN**.

(66)     On or about August 23, 1999, in the United Kingdom, defendants **CHRISTOPHER JOHN CORCORAN** and **TERENCE SILCOCK** and "D.U." met.

(67)     On or about September 6, 1999, in the United Kingdom, defendant **CHRISTOPHER JOHN CORCORAN** instructed one of the two potential buyers of Supernotes on codewords – including "jackets" – to use in discussing Supernotes.

(68)     On or about September 6, 1999, in the United Kingdom, defendant **CHRISTOPHER JOHN CORCORAN** assured the two potential buyers of Supernotes that defendant **SEAN GARLAND**, who was a "top IRA man" to whom he was related by marriage, had sent defendant **CHRISTOPHER JOHN CORCORAN** to address the problem of a possible leak in the Supernote organization.

(69)     On or before September 6, 1999, in the United Kingdom, defendant **CHRISTOPHER JOHN CORCORAN** stored in his cellphone a phone number of defendant **SEAN GARLAND**.

18

(70)     On or about September 7, 1999, in the United Kingdom, defendant

**CHRISTOPHER JOHN CORCORAN** told defendant **TERENCE SILCOCK** that he would

be meeting with defendant **DAVID LEVIN** the next day.

(71)     On or about September 7, 1999, in the United Kingdom, defendant

**CHRISTOPHER JOHN CORCORAN** told the two potential buyers of Supernotes that in

order to buy $1 million in Supernotes they would have to put up a bond as defendant **DAVID**

**LEVIN** had done.

(72)     On or about September 8, 1999, in the United Kingdom, defendants

**CHRISTOPHER JOHN CORCORAN** and **DAVID LEVIN** met, together with "D.U."

(73)     On or about October 20, 1999, in the United Kingdom, defendant

**TERENCE SILCOCK** gave passports containing Belarus visas to "J.D."

(74)     On or about October 21, 1999, in Copenhagen, Denmark, defendant

**SEAN GARLAND** faxed to Minsk, Belarus, a hotel reservation request for himself for the next

day.

(75)     On or about October 22, 1999, defendant **SEAN GARLAND** traveled

from Copenhagen, Denmark, to Minsk, Belarus.

(76)     On or about November 2, 1999, defendant **SEAN GARLAND** traveled to

Birmingham, United Kingdom.

(77)     On or about November 3, 1999, defendant **CHRISTOPHER JOHN**

**CORCORAN** traveled to Birmingham, United Kingdom.

(78)     On or about November 3, 1999, in the United Kingdom, defendants **SEAN**

**GARLAND**, **CHRISTOPHER JOHN CORCORAN**, and **TERENCE SILCOCK** met.

19

(79)    On or about November 6, 1999, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland.

(80)    On or about November 6, 1999, in Ireland, defendant **TERENCE SILCOCK** met couriers bringing money from defendant **DAVID LEVIN** for payment to defendant **SEAN GARLAND** through defendant **CHRISTOPHER JOHN CORCORAN**.

(81)    On or about November 24, 1999, in the United Kingdom, defendant **TERENCE SILCOCK** sent "D.U." to Ireland.

(82)    On or before November 29, 1999, in the United Kingdom, defendant **DAVID LEVIN** provided Supernotes to to "M.M." to exchange for British currency, which "M.M." then did, using a Lithuanian passport in the name of "Gediminas Gotautas".

(83)    On or about December 21, 1999, in the United Kingdom, defendant **TERENCE SILCOCK** sent "D.A." to Ireland to deliver money from defendant **DAVID LEVIN** to defendant **SEAN GARLAND** through defendant **CHRISTOPHER JOHN CORCORAN**.

(84)    On or about December 21, 1999, in Ireland, defendant **CHRISTOPHER JOHN CORCORAN** met with "D.A.", who gave him a package of money.

(85)    On or about December 21, 1999, in Ireland, defendants **SEAN GARLAND** and **CHRISTOPHER JOHN CORCORAN** met.

(86)    On or about January 16, 2000, in the United Kingdom, defendant **TERENCE SILCOCK** sent "D.U." to Ireland.

(87)    On or about February 8, 2000, in the United Kingdom, defendants **DAVID LEVIN**, **TERENCE SILCOCK**, and **MARK ADDERLEY** met.

20

(88)    On or about March 30, 2000, in the United Kingdom, defendants **DAVID LEVIN** and **MARK ADDERLEY** met, together with "M.M."

(89)    On or before March 30, 2000, in the United Kingdom, defendant **CHRISTOPHER JOHN CORCORAN** sent a package to defendant **DAVID LEVIN**, from Ireland to the United Kingdom, via "M.M."

(90)    On or about March 31, 2000, in the United Kingdom, defendant **DAVID LEVIN** caused an associate to make a telephone call inquiring whether the package from Ireland had arrived.

(91)    On or about March 31, 2000, in the United Kingdom, defendant **DAVID LEVIN** went to the residence of "M.M."

(92)    On or about March 31, 2000, in the United Kingdom, defendant **MARK ADDERLEY** gave defendant **TERENCE SILCOCK** a cash payment from defendant **DAVID LEVIN** for Supernotes.

(93)    On or about April 4, 2000, in the United Kingdom, defendant **TERENCE SILCOCK** picked up "A.B." from Birmingham Airport.

(94)    On or about April 4, 2000, in the United Kingdom, defendant **TERENCE SILCOCK** and "A.B." met with two persons sent by defendant **DAVID LEVIN**, and obtained passports containing Russian visas.

(95)    On or about April 4, 2000, in the United Kingdom, defendant **TERENCE SILCOCK** drove "A.B." back to Birmingham Airport, from where "A.B" flew back to Ireland.

(96)    On or about April 5, 2000, "T.L." and "G.D." traveled from Ireland to Minsk, Belarus, via the United Kingdom and Germany.

21

(97)    On or about April 5, 2000, in the United Kingdom, defendants **DAVID LEVIN**, **TERENCE SILCOCK**, and **MARK ADDERLEY** met.

(98)    On or about April 18, 2000, in the United Kingdom, defendants **TERENCE SILCOCK**, **DAVID LEVIN** and **MARK ADDERLEY** met, together with "M.M."

(99)    On or about April 18, 2000, in the United Kingdom, defendant **DAVID LEVIN** gave money to defendant **TERENCE SILCOCK** for Supernotes.

(100)    On or about April 20, 2000, in the United Kingdom, defendant **TERENCE SILCOCK** phoned defendant **CHRISTOPHER JOHN CORCORAN** from a public telephone.

(101)    In or about May 2000, in the United Kingdom, defendant **DAVID LEVIN** informed defendant **TERENCE SILCOCK** that **LEVIN** was no longer able to exchange quantities Supernotes through Russian banks, as an explanation for why **LEVIN** was having difficulty paying money owed to defendant **SEAN GARLAND** for Supernotes.

(102)    In or about May 2000, in the United Kingdom, defendant **DAVID LEVIN** informed defendant **TERENCE SILCOCK** that border authorities in Europe had confiscated $250,000 in Supernotes from **LEVIN**'s couriers, including "R.C.", as an explanation for why **LEVIN** was having difficulty paying money owed for Supernotes.

(103)    On or about May 17, 2000, defendant **TERENCE SILCOCK** traveled from the United Kingdom to Ireland.

(104)    On or about May 27, 2000, in the United Kingdom, defendant **TERENCE SILCOCK** faxed a Russian-language document relating to Russian banks' detection of Supernotes, and German-language documents relating to the border authorities' confiscation of

22

$250,000 in Supernotes, to defendant **CHRISTOPHER JOHN CORCORAN** in Ireland as evidence of why defendant **DAVID LEVIN** was having difficulty paying money owed for Supernotes.

(105)   On or about June 5, 2000, in the United Kingdom, defendant **TERENCE SILCOCK** met with defendant **DAVID LEVIN** to obtain money owed for Supernotes.

(106)   On or about June 6, 2000, in the United Kingdom, defendant **TERENCE SILCOCK** had a conversation with defendant **CHRISTOPHER JOHN CORCORAN**.

(107)   On or about June 7, 2000, in the United Kingdom, defendant **DAVID LEVIN** gave to defendant **TERENCE SILCOCK** money owed to defendant **SEAN GARLAND** for Supernotes.

(108)   On or about June 8, 2000, in the United Kingdom, defendants **TERENCE SILCOCK** and **MARK ADDERLEY** met and discussed a courier.

(109)   On or about June 8, 2000, in the United Kingdom, defendant **TERENCE SILCOCK** gave $98,000 to a courier for delivery to defendant **SEAN GARLAND** through defendant **CHRISTOPHER JOHN CORCORAN** in Ireland.

(110)   On or about June 9, 2000, in the United Kingdom, defendant **DAVID LEVIN** falsely stated to law enforcement authorities that he did not know the money he had been dealing in was counterfeit.

(111)   On or before July 7, 2000, in the United Kingdom, defendant **DAVID LEVIN** ascertained the whereabouts in Moscow, Russia, of approximately $70,000 in

23

Supernotes that he had obtained from the **SEAN GARLAND** Supernote organization, which

Supernotes were subsequently recovered by law enforcement authorities.

(**Conspiracy to Commit Counterfeit Acts Outside the United States**, in violation of Title 18, United States Code, Sections 371, 470 and 473)

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia